IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal No. 12-217 |
| | ) | |
| RONALD GARDNER, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION

This matter is before the Court on a Motion to Suppress Evidence, (Docket No. 25), filed by Defendant Ronald Gardner on January 22, 2013 and the Government's opposition thereto, (Docket No. 26). On March 7, 2013, the late Chief Judge Gary L. Lancaster Court held an evidentiary hearing on Gardner's motion. (Docket Nos. 30, 39). Following the reassignment of this case from Chief Judge Lancaster's docket, this Court held a hearing on June 24, 2013 during which the Court reviewed the physical evidence previously presented to Chief Judge Lancaster, (Gov. Ex. 1), accepted documentary exhibits from the parties which were not admitted at the initial hearing, (Def. Exs. 1-4, Docket Nos. 40-1:40-5), and heard oral argument from counsel. The official transcripts of both proceedings have been reviewed and considered by the Court. (Docket Nos. 39, 42). The parties then submitted proposed findings of fact and conclusions of law on October 7, 2013. (Docket Nos. 47, 48). Upon consideration of all of the parties' submissions and the evidence of record, and for the following reasons, Defendant's Motion to Suppress [25] is denied.

I.    FINDINGS OF FACT

          The credible evidence offered at the March 7, 2013 and
June 24, 2013 suppression hearing established the following facts.[1]

          On February 3, 2010, at approximately 1:30 a.m., Officer
Michael Manfredi of the Washington, Pennsylvania Police Department
responded to a police dispatch that a fight had occurred at the
Comfort Lounge bar in Washington, Pennsylvania.  (Transcript I at
5:11-17) (Officer Manfredi testifying).  When Officer Manfredi and
other officers entered the bar, they saw broken bottles and glass.
(Transcript I at 6:12-17) (Officer Manfredi testifying).  The
officers spoke with a female, Helen Jordan, who was bleeding from
the nose and stated that she had been beaten up by several
individuals, one of whom was "that Barfield boy."[2]  (Transcript I
at 6:12-17, 14:13-21) (Officer Manfredi testifying).  Jordan, who
was ultimately arrested for being drunk and disorderly, also
informed the police that the male individual involved in the fight
had displayed a handgun and that the actors had fled in "a white
vehicle."  (Transcript I at 6:24-7:14, 15:23-17:19) (Officer
Manfredi testifying).  The officers each testified that Ms. Jordan
described the vehicle as having "four doors," (Transcript I at 6-7

---
[1]     All citations to "Transcript I" refer to the March 7, 2013 hearing filed at
Docket No. 39.

[2]     Both of the officers who testified at the hearing were familiar with the
Barfield family from Washington, Pennsylvania.  (Transcript I at 15:02-19)

(Officer Manfredi testifying; at 30-31 (Officer Mitchell testifying)), but Officer Manfredi's police report prepared on the date of the incident states only that they were told by Ms. Jordan that "those involved in the altercation fled in a white vehicle" (Def. Ex. 3, Docket No. 40-3 at 2).

After leaving the bar, Officer Manfredi resumed his patrol. (Transcript I at 8:02-07) (Officer Manfredi testifying). Several minutes later, and approximately eight blocks from the bar, Officer Manfredi observed a white four-door Ford Taurus sedan exiting a nearby housing complex. (Transcript I at 8:02-08, 9:15-19) (Officer Manfredi testifying). According to Officer Manfredi, the housing complex, Maple Terrace Housing Projects, is considered a high-crime area. (Transcript I at 8:08-15) (Officer Manfredi testifying). Specifically, Officer Manfredi was personally familiar with a homicide that occurred in that location, as well as reports of gunfire and arrests in that area. (Transcript I at 8:12-15) (Officer Manfredi testifying). Officer Manfredi then ran the registration number of the vehicle through the National Crime Information Center database and learned that the vehicle had been reported as stolen. (Transcript I at 8:19-9:01) (Officer Manfredi testifying). Officer Manfredi followed the vehicle a short distance until it pulled up to a residence. (Transcript I at

_____

(Officer Manfredi testifying); (Transcript I at 37:19-38:15) (Officer Mitchell

3

10:20-11:05) (Officer Manfredi testifying). At that point, Officer Manfredi activated his police lights and back-up officers arrived on the scene. (Transcript I at 11:03-05) (Officer Manfredi testifying).

Officer Manfredi then ordered the driver of the vehicle, Trina Barfield, to exit the vehicle and walk towards him. (Transcript I at 11:07-10) (Officer Manfredi testifying). Barfield was visibly disoriented and was taken into custody by the officers. (Transcript I at 21:07-23) (Officer Manfredi testifying). Simultaneously, Gardner, who was sitting in the passenger seat, began to exit the vehicle despite repeated police orders to stay inside. (Transcript I at 11:12-12:05) (Officer Manfredi testifying). Officer Manfredi testified that once outside of the vehicle, Gardner complied with orders to lie on the ground where Officer Kent Mitchell handcuffed him. (Transcript I at 23:05-21) (Officer Manfredi testifying); (Transcript at I 32:10-12) (Officer Mitchell testifying).

Because of the concern over other potentially-armed occupants being inside the vehicle, Officer Manfredi then cleared the vehicle. (Transcript I at 12:12-13:06) (Officer Manfredi testifying). While Officer Manfredi was clearing the vehicle, Officer Mitchell performed a frisk of Gardner's person for officer

testifying).

safety. (Transcript I at 12:12-13:06) (Officer Manfredi testifying); (Transcript at 32:10-34:11) (Officer Mitchell testifying). At the time, Gardner was lying face down on the ground with his hands handcuffed behind his back. (Transcript I at 42:13-22) (Officer Mitchell testifying). During the frisk, Officer Mitchell turned Gardner onto his side and felt what he believed to be ammunition in Gardner's right front pants pocket. (Transcript I at 32:12-13, 43:07-44:10) (Officer Mitchell testifying). Officer Mitchell has extensive experience with firearms and ammunition, and handles ammunition on a daily basis. (Transcript I at 29:05-24) (Officer Mitchell testifying). According to Officer Mitchell, he was able to determine that what he felt in Gardner's pocket was ammunition based on the shape and heavy weight of the objects. (Transcript I at 33:15-34:01, 44:15-45:14) (Officer Mitchell testifying). Officer Mitchell removed the bag from Gardner's pocket and placed it on the ground. (Transcript I at 45:18-25) (Officer Mitchell testifying). The bag contained twelve .45-caliber rounds of ammunition. (Transcript I at 47:08-09) (Officer Mitchell testifying).

Officer Mitchell then placed Gardner in the back of the patrol car and proceeded to look inside the passenger area of the Ford Taurus. (Transcript I at 34:14-17) (Officer Mitchell testifying). In the rear passenger seat, Officer Mitchell located

the butt of a handgun protruding from underneath a baby seat. (Transcript I at 34:18-22) (Officer Mitchell testifying). Officer Mitchell seized the gun, which was determined to be a .45-caliber Springfield Army handgun containing six live rounds. (Transcript I at 47:09-13) (Officer Mitchell testifying).

According to Officer Mitchell, two other officers who arrived on the scene, Officer John Linley and Lieutenant John Yancosek, recognized Gardner as a felon at some point prior to his arrest.[3] (Transcript I at 32:14-24) (Officer Mitchell testifying). Officer Mitchell testified that even if the ammunition had not been found on Gardner's person, Gardner would have been arrested in connection with the bar fight and for possession of the gun in the backseat. (Transcript I at 34:23-35:21) (Officer Mitchell testifying).

II.  PROCEDURAL HISTORY

On August 14, 2012, the Government filed an Indictment charging Gardner with one count of Possession of a Firearm by a Convicted Felon, on or about February 3, 2010, in violation of 18 U.S.C. § 922(g)(1) and 924(e), and one count of Possession of Ammunition by a Convicted Felon, on or about February 3, 2010, in violation of 18 U.S.C. § 922(g)(1) and 924(e). (Docket No. 3). On January 22, 2013, Gardner filed the instant Motion to Suppress

---

[3]   Neither Officer Linley nor Lieutenant Yancosek testified at the evidentiary

Evidence. (Docket No. 25).  On February 4, 2013, the Government filed its Response to Gardner's Motion to Suppress, (Docket No. 26), and on February 14, 2013, Gardner filed his Reply, (Docket No. 27).

A hearing on the Motion to Suppress was held before the late Chief Judge Gary L. Lancaster, to whom this case was originally assigned, on March 7, 2013.  The case was then transferred to the current docket on May 8, 2013, following the untimely death of Chief Judge Lancaster. (Docket No. 32).  A status conference was held on May 16, 2013.  At the conference, counsel for the parties agreed that the evidentiary record for the pending motion to suppress had closed, but requested that the Court convene a hearing to review physical evidence in the possession of the case agents and to hear oral argument. (Docket No. 35).  This Court then held a hearing on June 24, 2013, (Docket No. 42), and the parties submitted post-hearing proposed findings of fact and conclusions of law on October 7, 2013, (Docket Nos. 47, 48).  As the matter has been fully briefed and argued, it is now ripe for disposition.

III.  <u>ARGUMENTS PRESENTED</u>

In his motion, Gardner moves to suppress the ammunition found on his person because "the evidence was seized in violation of the Fourth Amendment." (Docket No. 25, at 1; *see also* Docket No. 48 at

---

hearing.  (<u>See</u> Docket No. 30).

13). More specifically, Gardner asserts that the officer who patted him down exceeded the scope of a permissible frisk for weapons under Terry v. Ohio, 392 U.S. 1 (1968). (Id.). In response, the Government asserts that the officer possessed the requisite reasonable suspicion prior to patting down Gardner and was justified in seizing the ammunition. (Docket Nos. 26, 47). The Government further argues that even if the search of Gardner exceeded the bounds of Terry, the ammunition is admissible because the police officers inevitably would have discovered it during a valid warrantless search incident to arresting Gardner for being a felon in possession of a firearm. (Id.).

IV.   DISCUSSION

It is well-settled that, at a hearing on a motion to suppress, "the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge." United States v. Richardson, 501 F.Supp.2d 724, 734 (W.D. Pa. 2007) (citations omitted).[4]

A.   *Terry* Stop and Frisk

---

[4]   The parties have all agreed that, except for the Court's review of physical evidence conducted at the June 24, 2013 hearing, the Court shall make its rulings as to factual disputes and witness credibility based on the present record and without recalling witnesses. (Docket Nos. 37, 42). At the June 24, 2013 hearing, the defense presented certain police reports as exhibits, the introduction of which were not objected to by the Government. (Def. Exs. 1-4, Docket Nos. 40-2:40-5).

The Fourth Amendment protects citizens against unreasonable searches and seizures. U.S. CONST. AMEND. IV. See also United States v. Ubiles, 224 F.3d 213, 216 (3d Cir. 2000). Warrantless searches are per se unreasonable subject only to a few specifically established and well delineated exceptions. Horton v. California, 496 U.S. 128, 133 (1990). Because no warrant authorized the search here, the burden is on the Government to prove by a preponderance of the evidence that the search fell within one of the recognized exceptions to the warrant requirement. United States v. Herrold, 962 F.2d 1131, 1137 (3d Cir. 1992). One exception to the warrant requirement is the Terry stop and frisk. 392 U.S. at 20-22.

Here, the Government asserts that pursuant to Terry, the police officers possessed reasonable suspicion to stop and conduct a pat-down search of Gardner for weapons or contraband. (Docket Nos. 26, 47). The Government further argues that, under the plain feel doctrine, the officer conducting the pat-down discovered a bag of what he believed to be ammunition in Gardner's pocket, which the officer reasonably seized as a weapon pursuant to Terry. (Id.). The ammunition was also seized as contraband because Gardner, a felon, is prohibited from possessing such items. (Id.).

The Terry stop and the Terry pat-down frisk are two separate and distinct determinations: "our inquiry is a dual one -

whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." Terry, 392 U.S. at 19-20. In other words, the frisk does not follow automatically from the stop. See Adams v. Williams, 407 U.S. 143, 146 (1977) ("So long as the officer is entitled to make a forcible stop, and has reason to believe that the suspect is armed and dangerous, he may conduct a weapons search limited in scope to this protective purpose.") (citing Terry, 392 U.S. at 30) (footnote omitted) (emphasis added). Accordingly, the Court will address the Terry stop and frisk in two parts: (1) whether reasonable suspicion existed to stop and detain Gardner under Terry; and (2) whether the pat-down frisk was objectively reasonable under Terry, i.e., whether the police officer's removal of the ammunition in Gardner's pocket pursuant to the "plain feel" doctrine was reasonable.

### 1. Reasonableness of the *Terry* Stop

Generally, Terry permits a police officer to conduct "a brief investigatory stop when he or she has a reasonable, articulable suspicion that criminal activity is afoot." Illinois v. Wardlow, 528 U.S. 119, 123 (2000) (citing Terry, 392 U.S. at 30). "[I]n a traffic-stop setting, the first Terry condition—a lawful investigatory stop—is met whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a

vehicular violation." Arizona v. Johnson, 555 U.S. 323, 327 (2009). It is well established that officers are permitted to pull over a car suspected of violating any applicable vehicular traffic laws, United States v. Bonner, 363 F.3d 213, 216 (3d Cir. 2004) (citations omitted), such as a report that a vehicle was stolen. No further suspicion of criminal activity by the driver of the vehicle or the passengers therein is necessary to justify the Terry stop of the vehicle. Johnson, 555 U.S. at 327.

In the present case, Gardner concedes that the police officers were justified in conducting the initial traffic stop of the vehicle because it was reported stolen. (See Docket No. 48 at 13 ("Although the initial stop of the vehicle, which had been reported stolen, was lawful …"); Docket No. 42 at 41 ("We would agree that … the police … had probable cause for the stop of the car because it was reported stolen)). The Court agrees that the officers had reasonable suspicion to stop the vehicle and investigate whether it was stolen or not. Accordingly, the Government has established the first element of the Terry inquiry by a preponderance of the evidence.

2. Reasonableness of the *Terry* Frisk

Prior to addressing the scope of the frisk, i.e., Officer Mitchell's removal of the bag of ammunition from Gardner's pocket, the Court must determine whether it was objectively reasonable for

the police officer to frisk Gardner.  Defendant maintains that the frisk executed by Officer Mitchell violated his Constitutional rights because the supposed bases for the search are allegedly insufficient to demonstrate that he possessed objective and particularized facts supporting a finding that he had reasonable suspicion to believe that Gardner was armed and dangerous or posed a threat to the officers' safety.  (Docket Nos. 25; 48 at 16-21).  The Government maintains that Officer Mitchell's frisk was within the bounds of Terry and fully supported by the totality of the facts presented at the suppression hearing.  (Docket No. 47 at 14-18).

"To justify a patdown of the driver or a passenger during a traffic stop, ... the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous." Johnson, 555 U.S. at 326.  "The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence." Adams v. Williams, 407 U.S. 143, 146 (1972).  To assess the legality of a protective frisk, a court also looks at the "totality of the circumstances - the whole picture" to see whether the officer had a particularized, objective basis for his or her suspicion. United States v. Cortez, 449 U.S. 411, 417 (1981). A mere "hunch" or "inchoate and unparticularized suspicion" cannot justify a search

for weapons under <u>Terry</u>.  <u>Terry</u>, 392 U.S. at 27.  Any evidence obtained pursuant to a search that does not meet this exception must be suppressed as "fruit of the poisonous tree." <u>United States v. Brown</u>, 448 F.3d 239, 244 (3d Cir. 2006) (citing <u>Wong Sun v. United States</u>, 371 U.S. 471, 487-88 (1963)).

Reasonable suspicion, while not rigidly defined, may be the result of the following factors: "specialized knowledge and investigative inferences," "personal observation of suspicious behavior," "information from sources that prove to be reliable, and information from sources that-while unknown to the police-prove by the accuracy and intimacy of the information provided to be reliable at least as to the details contained within that tip." <u>United States v. Brown</u>, 448 F.3d 239, 247 (3d Cir. 2006) (citation omitted).  Depending upon the totality of the circumstances, reasonable suspicion may be the result of one or a combination of the above and other relevant factors.

In evaluating the officer's actions, the Court must defer to the "officer's knowledge of the nature and nuances of the type of criminal activity the officer has observed." <u>United States v. Robertson</u>, 305 F.3d 164, 166 (3d Cir. 2002) (citing <u>United States v. Nelson</u>, 284 F.3d 472 (3d Cir. 2002)).  In addition, the United States Court of Appeals for the Third Circuit gives considerable deference to police officers' determinations of reasonable

suspicion. See, e.g., Nelson, 284 F.3d at 482. Similarly, courts often defer to personal observations and conclusions on the theory that experienced officers can infer criminal activity from conduct that may seem innocuous to a lay person. United States v. Arvizu, 534 U.S. 266, 273 (2002); see also Wardlow, 528 U.S. at 124.

Here, the Court finds that "a man of reasonable caution" would have believed that Gardner may have been armed and dangerous and posed a threat to the officers or others based on the totality of the circumstances faced by the officers, particularly: (1) the stolen vehicle that they had pulled over matched the general description of the white vehicle that fled the scene of the altercation at the bar; (2) the report from a witness at the scene of the altercation that one of the male actors had brandished a gun; (3) the woman driving the vehicle was visibly drunk, indicating that she and her male passenger may have been at the bar; (4) the suspicious behavior of the male in the car, including his exiting the car despite officers' repeated commands to stay inside the vehicle;[5] (5) the fact that the traffic stop took place

---

[5]      Defendant argues that the record evidence does not establish that he "repeatedly ignored and disregarded" multiple warnings to not get out of the vehicle. (Docket No. 48 at n.1).  The Court disagrees as Officer Manfredi testified consistent with such a finding at the hearing and his testimony is corroborated by the information he included in his initial police report.  To this end, Officer Manfredi testified that:

> A: ... She [Trina Barfield] gets out of the vehicle and she's taken into custody. As she's being taken into custody, the passenger side door opened up. Myself and other officers yelled at the passenger to close the door and stay in the car. We weren't prepared for his exit, yet, and his departure from the car. So, multiple times we did that. And the passenger exited the car, anyway, and then he immediately complied with our orders to get on the ground.
>
> Q: Now, when you say, multiple times you did that, you're referring to commands to stay inside the car?

in close vicinity to the bar (less than half a mile away) and in close proximity to the events at the bar (within ten to fifteen minutes of the initial report of criminal conduct); (6) the late hour of the stop; and (7) the high-crime area in which the investigative stop took place.

In reaching this decision, the Court expressly rejects Defendant's assertions that the Government's evidentiary support for the Terry frisk was not supported by the record. To this end, Defendant raises four separate challenges to the Government's presentation, i.e.: (1) an alleged lack of legal support for the proposition that a passenger in a stolen car is necessarily armed and dangerous; (2) an asserted failure of the Government to prove that the officers possessed reasonable suspicion to believe that Gardner was a passenger in the same vehicle that fled the bar; (3) a claimed failure of the Government to demonstrate that Gardner was "that Barfield boy" who brandished the firearm in the bar; and (4) the facts that the vehicle was leaving a housing project and located in a high crime area are arguably insufficient to demonstrate that Gardner himself was armed and dangerous. (Docket No. 48 at 16-21). The Court does not generally disagree with

---

A: Yes.

Q: Fair to say he disregarded those commands?

A: Absolutely. Yes.

(Transcript I at 11:13-11:23 (Officer Manfredi testifying)). Officer Manfredi's police report notes that after Barfield exited the vehicle, "against several Officers [sic] orders, the passenger exited the vehicle. The passenger, later identified as Ronnie Gardner, did comply with the order to get on the ground and was

Defendant that, if viewed in isolation and apart from the other evidence adduced by the Government, these facts may independently be deemed insufficient to support a <u>Terry</u> frisk or at least present a "close call" for the Court to decide. However, the Court's standard of review does not require it to parse through the Government's evidence in such a piecemeal fashion.[6] Rather, the Court is instructed to determine the reasonableness of the <u>Terry</u> frisk after considering the totality of the circumstances involved. <u>See</u> <u>Cortez</u>, 449 U.S. at 417 ("the totality of the circumstances—the whole picture—must be taken into account."). Applying that standard to the credible evidence presented by the Government in this case leads the Court to conclude that Officer Mitchell's decision to frisk Gardner for weapons was objectively reasonable and within the confines of <u>Terry</u>. <u>Id</u>.

The Court next turns to Defendant's challenges to the scope of that frisk and whether the officer's pat-down and removal of the object in Gardner's pocket was reasonable. (Docket Nos. 25, 48). A protective frisk must be strictly "limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby," <u>Terry</u>, 392 U.S. at 26, such as

---

immediately handcuffed by Officer Mitchell." (Def. Ex. 3, Docket No. 40-4).

[6] Indeed, Defendant recognizes that the additional facts presented by the Government may be sufficient to support the <u>Terry</u> frisk. (See Docket No. 48 at 21 ("However, even if the Court finds that the circumstances surrounding the pulling over of a car which had been reported stolen, and was leaving a housing project, which Sergeant Manfredi identified as a 'high crime area' were sufficient to provide reasonable suspicion that Mr. Gardner was armed and dangerous ...")).

"guns, knives, clubs, or other hidden instruments [possibly used] for the assault of the police officer," Id. at 29.   If the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under Terry and its fruits will be suppressed.  Sibron v. New York, 392 U.S. 40, 65-66 (1968); Baker v. Monroe Township, 50 F.3d 1186, 1194 (3d Cir. 1995).

According to the Supreme Court of the United States in Minnesota v. Dickerson, "[i]f a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons . . . ."  508 U.S. 366, 375 (1993). The United States Court of Appeals for the Third Circuit applied the Dickerson holding in United States v. Yamba, 506 F.3d 251, 258-59 (2007) to emphasize that the order of events is critical to a determination of the proper scope of a Terry frisk.  Our Court of Appeals held in Yamba that "the proper question under Dickerson, is not the immediacy and certainty with which an officer knows an object to be contraband or the amount of manipulation required to acquire that knowledge, but rather what the officer believes the object is by the time he concludes that it is not a weapon."  Id. at 259.  An officer "is allowed to slide or manipulate an object in a suspect's pocket, consistent with a routine frisk, until the

officer is able reasonably to eliminate the possibility that the object is a weapon." <u>Yamba</u>, 506 F.3d at 259. "If, before that point, the officer develops probable cause to believe, given his training and experience, that an object is contraband, he may lawfully perform a more intrusive search" and will be justified in seizing any contraband he discovers. <u>See</u> <u>Dickerson</u>, 508 U.S. at 375–76.

Defendant essentially raises a three-pronged attack on the scope of the search executed by Officer Mitchell. (Docket Nos. 25, 48). He initially argues that the scope of the frisk was unnecessary because he was handcuffed, lying helplessly face down on the ground, making it "impossible" for him to load the bullets into a firearm. (Docket No. 48 at 21-22). Defendant next contends that bullets should not be considered weapons under <u>Terry</u> and related jurisprudence and therefore Officer Mitchell's manipulation of the non-weapons in Gardner's pocket was constitutionally invalid. (<u>Id</u>. at 22-24). Finally, Defendant maintains that the bullets should not be considered contraband under the <u>Terry</u> line of cases because the timing of events was such that Officer Mitchell completed his search prior to learning that Gardner was a felon barred from possessing such items from the officers who later arrived at the scene.[7] (Docket No. 42 at 38-40). The Government

---

[7] The Court notes that defense counsel argued this position at the motion hearing but did not explicitly rely on such arguments in Defendant's

argues that Defendant's positions are legally and/or factually incorrect and suggests that the totality of the circumstances supported the scope of the frisk executed by Officer Mitchell. (Docket No. 47).  The Court agrees with the Government that the totality of the circumstances supported the scope of the Terry frisk and that the same did not violate controlling precedent.

Before announcing its specific factual findings and legal conclusions supporting this holding, the Court will briefly discuss several points raised by Defendant's arguments.  The Court first rejects Defendant's position that his being handcuffed and face down on the ground rendered it impossible for him to harm the officers because such argument is neither legally nor factually supported.[8]  The Court believes that the decisions that Defendant cites, Arizona v. Gant, 556 U.S. 332, 335 (2009), and United States v. Miles, 247 F.3d 1009, 1013-14 (9th Cir. 2001), do not stand for a blanket proposition that a handcuffed individual may not be frisked or searched by law enforcement in all circumstances, as Defendant suggests.  Indeed, our Court of Appeals has recognized the opposite in United States v. Shakir, 616 F.3d 315, 321 (3d Cir. 2010), holding that "reading Gant to prohibit a search incident to arrest whenever an arrestee is handcuffed would expose police to an

---

Proposed Findings of Fact and Conclusions of Law; instead Defendant focuses on the two main arguments noted herein.  (See generally Docket No. 48).  It appears that this argument has been abandoned by the defense, but the Court includes it here for completeness.  See n.12, infra.

[8]        The Court notes that Defendant does not claim that the act of handcuffing him violated his Constitutional rights.  (See Docket Nos. 25, 48).

unreasonable risk of harm," because handcuffs are not full proof and placement of same on individuals by officers does not eliminate all potential risks of harm posed by such individuals to officers.[9] Instead, the Court of Appeals favors an approach which considers the totality of the circumstances to determine if the search is reasonable.[10] <u>Id</u>. In light of <u>Shakir</u>, which is binding on this Court, along with additional precedent more fully discussed below, the Court believes that the facts of Defendant being handcuffed, while lying face down on the ground in submission to the authority of a law enforcement officer (including acquiescing to the officer rolling him over to pat him down) are not dispositive but merely facts which should be considered when evaluating the totality of the facts supporting the frisk. <u>Id</u>. Further, as is noted in the preceding discussion of this Opinion and more fully developed below, the credible facts of the instant frisk were such that Officer Mitchell reasonably believed that Gardner may be armed and

---

[9] The Court of Appeals made this ruling immediately after citing <u>United States v. Sanders</u>, 994 F.2d 200, 209 (5th Cir. 1993), with approval and quoting the entirety of the following passage, which the Government also relies on here:

> [it is not true that] ... by handcuffing a suspect, the police instantly and completely eliminate all risks that the suspect will flee or do them harm.... Handcuffs are a temporary restraining device; they limit but do not eliminate a person's ability to perform various acts. They obviously do not impair a person's ability to use his legs and feet, whether to walk, run, or kick. Handcuffs do limit a person's ability to use his hands and arms, but the degree of the effectiveness of handcuffs in this role depends on a variety of factors, including the handcuffed person's size, strength, bone and joint structure, flexibility, and tolerance of pain. Albeit difficult, it is by no means impossible for a handcuffed person to obtain and use a weapon concealed on his person or within lunge reach, and in so doing to cause injury to his intended victim, to a bystander, or even to himself. Finally, like any mechanical device, handcuffs can and do fail on occasion.

<u>Shakir</u>, 616 F.3d at 321 (quoting <u>Sanders</u>, 994 F.2d at 209).

[10] It is also noteworthy that Defendant comments that Shakir represents a post-Gant decision which "carefully analyzed the threat posed" by the

a threat to the safety of the officers and his seizure of the bullets in Gardner's pocket was not only reasonable but also justified the continued search of the rest of Gardner's person for a likely firearm.

Defendant also contends that this Court should follow the Ninth Circuit's decision in Miles, 247 F.3d at 1013-14, and the Eastern District of Wisconsin's opinion in United States v. Lemons, 153 F. Supp. 2d 948, 961 (E.D. Wisc. 2001) and hold that Officer Mitchell's frisk was unreasonable because the bullets in question allegedly do not constitute weapons or contraband under Terry and Dickerson. (Docket No. 48 at 21-27). In Miles, the Ninth Circuit found that an officer's manipulation of a box inside a defendant's pocket which he had determined was not a weapon or contraband prior to shaking the box and discovering bullets exceeded the bounds of the Terry frisk. Miles, 247 F.3d at 1013-14. Lemons likewise held that an officer's squeezing of a sweat sock inside a defendant's jacket before finding bullets violated Terry. Lemons, 153 F. Supp. 2d at 961. Neither Miles nor Lemons constitutes binding precedent and this Court is not persuaded that either decision should be followed because the totality of the circumstances present here make those decisions distinguishable.

---

defendant and concluded that a search of a handcuffed and otherwise detained individual was reasonable. (Docket No. 48 at n.2).

To this end, as the District Court in United States v. Kinsey, --- F. Supp. 2d. ---- 2013 WL 3379298, at *4-5 (E.D. Wash. Jul. 3, 2013), explains, the decision in Miles is distinguishable because it turned not as much on the legal principles annunciated therein but on a failure of the Government's proof in that case. The officer in Miles testified that he did not immediately believe that the small box he felt in the defendant's pocket was a weapon and/or contraband and the Ninth Circuit held that the Government did not develop a sufficient factual record as to what the officer believed may have been contained within the small box. Miles, 247 F.3d at 1014; see also Kinsey, 2013 WL 3379298, at *4-5. Without any such evidence, the Ninth Circuit found that the record demonstrated only that it was clear that "the object was a small box and could not possibly be a weapon" and concluded that the officer violated Dickerson by manipulating the box (a known, non-weapon) by shaking it to determine what was inside. Id. Here, Officer Mitchell testified that he recognized the objects to be bullets during the initial frisk because of his extensive experience with firearms and ammunition, was able to do so without sliding one of the bullets away from the other eleven bullets which were also in the bag and only conducted a further search by squeezing the objects to confirm his initial belief that they were

bullets. (Transcript I at 29:5-24, 33:15-34:1, 34:10-12, 44:15-45:14) (Officer Mitchell testifying)

The decision in Lemons has never been cited as persuasive authority by any court within the Third Circuit.  In this Court's estimation, like Miles, the outcome of Lemons turns more on a credibility determination of the evidence by the Court than a pure legal ruling that an officer must have information that an individual is a felon prior to recovering bullets as contraband during a Terry frisk.  See Lemons, 153 F. Supp. 2d at 958.  For example, the District Court discredited testimony from the officer, "find[ing] it at least somewhat questionable that bullets would be immediately identifiable through those layers," i.e., a sweat sock located inside the pocket of a jacket.  Id. The additional facts of Lemons also demonstrate that the officer stopped his frisk and asked the defendant if he could remove the object from his jacket and search it, to which defendant consented.  Id.  Only after this further investigation did the officer discover that the objects were ammunition.  Id.  Thus, the investigation conducted by the officer in Lemons went beyond the type of frisk contemplated in Dickerson, separating it factually from the instant matter which did not include any investigative questioning by Officer Mitchell or a second, follow-up search of Gardner's person.

This Court is also persuaded by the decisions cited by the Government, particularly, <u>United States v. Jackson</u>, 179 F. App'x 921 (6th Cir. 2006); <u>United States v. Whitsett</u>, 2005 WL 3359082, at *7 (N.D. Ind. 2005), *aff'd on other grounds*, 207 F. App'x 723 (7th Cir. 2006); and <u>United States v. Teague</u>, 2010 WL 6529640 (N.D. Ga. 2010), that the frisk of Gardner and seizure of the bullets by Officer Mitchell was reasonable under <u>Dickerson</u>, regardless if the bullets are expressly deemed to constitute "weapons" or "contraband" as those terms are used in <u>Dickerson</u> and subsequent precedent. These decisions (<u>Jackson</u>, <u>Whitsett</u>, and <u>Teague</u>) focus not as much on the nature of the objects seized (i.e., bullets) but the reasonableness of the conduct of law enforcement in light of the totality of the circumstances, which is the overarching standard this Court must apply. Further, the factual record before the Courts in <u>Jackson</u>, <u>Whitsett</u>, and <u>Teague</u> demonstrated that the bullets were seized by the officers at a point in time prior to the completion of the frisks of the defendants, which the Courts also deemed were authorized by <u>Terry</u>. <u>See</u> <u>e.g.</u> <u>id</u>. Thus, the officers' recovery of the bullets was determined to be reasonable in each instance because the officers did not know if the defendants also possessed firearms at the precise time the bullets were seized and the seizures were effected to protect the officers from the possibility that the defendants

possessed and/or had access to firearms, which the bullets could then be inserted into and possibly fired at them.  Id.  The same is true in the instant case.

Having addressed those legal matters, the Court now turns to its holding that the scope of the Terry frisk executed here was reasonable in light of controlling precedent, i.e., Dickerson and Yamba. In all, this Court concludes that Officer Mitchell's pat-down search did not exceed the permissible scope of Terry when he seized the bag of ammunition from Gardner's pocket.  During the evidentiary hearing, Officer Mitchell testified in the following manner regarding his extensive background with firearms and ammunition:

> Q: And in terms of your experience with firearms, why don't you give the Court a little background about your experience with firearms and ammunition?
>
> A: I probably have about twenty years, now. I started hunting when I was ten. I currently possess forty handguns, multiple long rifles, ARs, shotguns. When I was younger, I also was a, with my father we did reloading for ammunition.
>
> Q: What is that?
>
> A: What is reloading? Just ammunition spent through cartridges. We would reload our ammunition. Save some money.
>
> Q: Do you frequently go to gun ranges, now?
>
> A: Yes. Qualifications, we have to qualify every year through the City. Also, in my free

time, I try to get out every couple months at
least to practice.

Q: Do you frequently, I guess, handle
ammunition?

A: Yes. On a daily basis. I'll usually try to
change out my ammunition, make sure it's still
working properly. All the, all the cartridges.

Q: Are you familiar with .45 caliber
ammunition?

A: Yes. It's currently the handgun I'm
carrying for duty.

(Transcript I at 29:5-24) (Officer Mitchell testifying).

Thereafter, Officer Mitchell testified as to what he felt during

his frisk of Gardner:

Q: What, if anything, did you recognize from
patting down the defendant?

A: Ammunition in the right front pocket.

Q: How did you recognize that?

A: My experience as a police officer, as well,
like I said, being around firearms since age
of ten.

Q: Did you -- in terms of what specifically
did you feel?

A: The size. The heavy, it was like it
probably was like a handgun, round. Heavy in
weight in the pocket.

Q: Were you able to tell this, I guess, before
the bag of ammunition came out of his pocket?

A: Yes.

(Transcript I at 33:15-34:1).   On cross-examination, Officer

Mitchell added the following:

> Q: … when you grabbed it, you felt, basically,
> a bag with something heavy in it; right?
>
> A: No. It -- I felt what would have been
> bullets.
>
> Q: And you could tell these were bullets how?
>
> A: Due to my experience.
>
> Q: Due to your experience. But that really
> wasn't my question. My question was, what
> about this bag when you felt it in the pocket
> −
>
> A: Bullets themselves. Having a shape.
>
> Q: So, was it then necessary for you separate
> out to see what shape it has because there's
> twelve objects in this bag; right?
>
> A: No.
>
> Q: There's not twelve bullets in this bag?
>
> A: Yes. There's twelve bullets in the bag.
>
> Q: There were twelve bullets in the bag when
> you felt it in the pocket, too; right?
>
> A: Correct.
>
> Q: So, in order to tell the shape of an
> individual bullet, you had to separate it out
> from the group to see what its shape was;
> right?
>
> A: No. Right there, I can feel one bullet
> without separating anything.
>
> Q: So, you had to squeeze it to feel the tip
> of the bullet?

A: Yes, when he had it in his pocket.

(Transcript I at 44:15-45:14) (Officer Mitchell testifying). Officer Mitchell later testified on re-direct that at no point during the frisk did he conclude that what he felt in Gardner's pocket was "a harmless object." (Transcript I at 48:03-07) (Officer Mitchell testifying). According to his testimony, after removing the ammunition from Gardner's pocket, Officer Mitchell continued "to check [Gardner] the rest of the way down to his feet, around his ankles, in case there was still a gun down there." (Transcript I at 34:10-12).

In this Court's opinion, the credible evidence establishes that Officer Mitchell had not ruled out the possibility, at any point during the frisk, that the items he felt in Gardner's pocket (i.e., the bag of bullets) may have been able to be used by Gardner to harm him or the other officers. Officer Mitchell recognized the ammunition by plain feel almost immediately because he had felt similar objects hundreds of times in the past given his extensive experience with firearms and ammunition over a period of twenty years. See United States v. Goode, 486 Fed. App'x 261, 264 (3d Cir. 2012) (officer was able to determine that object in defendant's pocket was narcotics based on experience); see also United States v. Johnson, 452 F. App'x 219, 226 (3d Cir. 2011) (officer determined that object in defendant's pocket was

contraband based on his experience and training).  Officer Mitchell testified that he was also intimately familiar with .45 caliber ammunition because this was the same type of ammunition he was using with his .45 caliber service weapon at the time of the hearing and likewise explained that he handled such ammunition on a daily basis.  Id.  Therefore, while the Court may not have been able to make the determination that the objects were bullets immediately upon feeling the hard objects inside the jewelry bag when the evidence was presented at the hearing, without first knowing that bullets were present inside, the Court finds Officer Mitchell's extensive experience with ammunition was such that he testified credibly that he was able to identify the objects as bullets during the frisk of Gardner.

In Terry, the Supreme Court indicated that the frisk serves the "immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him."  Terry, 392 U.S. at 23; see also Yamba, 506 F.3d at 259 ("Assuming that an officer is authorized to conduct a Terry search at all, he is authorized to assure himself that a suspect has no weapons.").  "The sole justification of the search … is the protection of the police officer and others nearby, and it must therefore be confined in scope to an intrusion reasonably designed

to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." Terry, 392 U.S. at 29. Unlike the officer conducting the search in Dickerson who continued to search the suspect's pocket "after having concluded that it contained no weapon," Dickerson, 506 U.S. at 378, Officer Mitchell's testimony does not imply any such conclusion about the items he felt in Gardner's pocket – which he recognized to be bullets – and the scope of the intrusion was limited to the search for and recovery of the bullets.

In addition, after locating the bullets, Officer Mitchell properly continued to frisk the rest of Gardner's body to determine if he was also carrying a firearm from which those bullets could be fired. See Jackson, 179 F. App'x at 931 (noting that officer's "removal of the ammunition pouch, before he had completed the frisk to exclude the possibility that [the defendant] had a gun on him, was reasonable."). Therefore, like the Courts in Jackson, Whitsett, Teague, and Kinsey, this Court concludes that the seizure of the bullets by Officer Mitchell was objectively reasonable because the bullets were discovered prior to the completion of the Terry frisk for weapons and were removed to protect him and the other officers from potential harm. See e.g. Jackson, 179 F. App'x 921; Whitsett, 2005 WL 3359082, at *7; Teague, 2010 WL 6529640; Kinsey, 2013 WL 3379298, at *4-5. His seizure of the bag of

bullets is likewise objectively reasonable when viewed in the context of the situation as a whole, which involved, among other things, an initial report of a gun being brandished during the bar fight, the evolving late-night traffic stop of a stolen "white vehicle" operated by a drunk driver in a high crime area, and all of the other events which ensued prior to the <u>Terry</u> frisk. <u>See</u> <u>Terry</u>, 392 U.S. at 21-22 ("the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate.").

The Court alternatively recognizes that even if ammunition (without the simultaneous presence of a firearm) is not properly characterized as a weapon <u>per se</u> under <u>Terry</u> and related jurisprudence,[11] the bag of twelve bullets which was seized by Officer Mitchell from Gardner's person is reasonably characterized as a "weapon" for <u>Terry</u> purposes. To this end, the Court held and examined the bag of bullets, recognizing that they were hefty, hard objects. (Govt. Ex. 1; Docket No. 42 at 12-13). In addition, each of the twelve bullets was one inch in length, made of silver with copper tips. (<u>Id</u>.). As the Court noted at the hearing, this bag of twelve, tightly packed bullets could possibly have been used as a weapon to assault Officer Mitchell or the other officers, even if

---

[11] Again, the decision by the District Court in <u>Lemons</u> is not binding on this Court, does not analyze relevant Third Circuit precedent, i.e., <u>Yamba</u>,

the contents consisted of rocks or some other objects rather than bullets given its size and weight. (Docket No. 42 at 54-55).

Again, Terry held that permitted seizures are not limited to retrieval of only firearms or knives but more broadly considered "an intrusion reasonably designed to discover guns, knives, clubs, **or other hidden instruments for the assault of the police officer.**" Terry, 392 U.S. at 29 (emphasis added). Several courts, including this one, have recognized many different types of objects described variously as "hard," "bulky," "heavy" and the like were properly removed from suspects as potential weapons. See United States v. Edwards, 53 F.3d 616 (3d Cir. 1995) (officer detected "a large, hard, bulky object"); see also United States v. Pasca, Cr. No. 07-182, 2008 WL 1752239, at * (W.D. Pa. Apr. 14, 2008) (officer felt "hard rectangular item or items"). In this Court's estimation, the bag which was seized from Officer Mitchell could have been used as a potential weapon against him or the other officers and it was objectively reasonable for him to remove it from Gardner's person, regardless of whether he identified the contents as bullets or not. Further, as the relevant inquiry is an objective standard, the fact that Officer Mitchell testified that he removed the bullets because he thought there was a gun present rather than to prevent Gardner from assaulting him with the bag, is not controlling. Indeed, the

---

and remains unpersuasive.

32

"subjective motive or intent [of the officer] is not relevant for
Terry purposes." United States v. Goodrich, 450 F.3d 552, 559 (3d
Cir.2006); see also United States v. Pittman, 338 F. App'x 147, 149
(3d Cir. 2009) ("As noted, Deputy Kurten frisked Pittman only after
events giving rise to reasonable suspicion had occurred. Whether
Deputy Kurten intended or was prepared to undertake the frisk in
the absence of these events is not relevant, under Terry, to our
objective assessment"). Accordingly, the Court finds that it was
objectively reasonable for Officer Mitchell to remove the bag of
bullets on this alternative theory as well.

In all, after considering the totality of the relevant
facts, the Court finds that a reasonable person in Officer
Mitchell's circumstances could have justifiably believed that the
items in Gardner's pocket posed a danger to himself or to other
officers. See Terry, 392 U.S. at 21-22 ("the facts available to the
officer at the moment of the seizure or the search 'warrant a man
of reasonable caution in the belief' that the action taken was
appropriate."). As such, because the officer's exploration of
Gardner's pocket never exceeded the justification of a Terry
search, i.e., the protection of the police officer and others
nearby, in that the officer reasonably believed the item or items
in Gardner's pocket could be used or inserted into a weapon,

Officer Mitchell's decision to remove the ammunition from Gardner's pocket did not exceed the bounds of <u>Terry</u>.[12]

Under these circumstances, the Court finds that the Officer's actions did not violate Gardner's Fourth Amendment rights. Accordingly, Defendant's Motion to Suppress [25] is denied.

B. <u>Inevitable Discovery Doctrine</u>

The Government also contends that, even if the stop and frisk had exceeded the bounds of <u>Terry</u>, the evidence at issue would have been found as a matter of course during a valid warrantless search incident to Gardner's arrest for being a felon in possession of a firearm. (Docket Nos. 27 at 6; 47 at 29-33). Defendant suggests that the application of the doctrine of inevitable discovery is not appropriate based on the record evidence in this case. (Docket No. 48). The Court once again agrees with the Government's position and alternatively holds that if the <u>Terry</u> search of Gardner and seizure of the bag of bullets were deemed unconstitutional, the Government has proven that the inevitable

---

[12]     Given this holding, the Court need not reach the additional question of whether the ammunition constituted "contraband" because such ammunition may be lawfully possessed by citizens and Officer Mitchell was not aware that Gardner was a felon restricted from possessing such instruments at the time of the <u>Terry</u> search. (Docket No. 48). It is, however, undisputed that Gardner is a prior felon and that Officer Mitchell acquired this information shortly after the <u>Terry</u> frisk was executed, when additional officers arrived at the scene and provided him with such information. (Docket Nos. 47, 48). The Government has not specifically argued that inevitable discovery would apply with respect to this aspect of the search and seizure of the bullets. (Docket No. 47). However, if Defendant's position was adopted that Officer Mitchell should have left the bullets he readily identified on Gardner's person because he did not know that Gardner was prohibited from possessing them, the officers would have learned that he was a felon before the traffic stop was completed and at that point, the officers obviously would have probable cause to conduct another search and seizure of the bullets on Gardner's person. <u>See</u> <u>Arizona v. Gant</u>, 556 U.S. 332, 338 (2009).

discovery doctrine would otherwise save the evidence from exclusion at trial.

The inevitable discovery doctrine permits the admission of illegally obtained evidence where it can be shown that such evidence would have been discovered by the authorities through a proper channel.  See Nix v. Williams, 467 U.S. 431, 444 (1984). Evidence obtained unlawfully is admissible "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means," i.e., that it would have been discovered in the absence of the Fourth Amendment violation.  Id.  The Government can meet its burden by establishing "that the police, following routine procedures, would inevitably have uncovered the evidence."  United States v. Stabile, 633 F.3d 219, 245 (3d Cir. 2011) (citing United States v. Vasquez De Reyes, 149 F.3d 192, 195 (3d Cir. 1998)). This limitation on the scope of the exclusionary rule insures that the police and the prosecution are not put in a worse position than if there had been no Fourth Amendment violation.  See Nix, 467 U.S. at 443-44.

Under the Supreme Court's holding in Arizona v. Gant, 556 U.S. 332, 338 (2009), a full search of a person incident to a lawful arrest is a reasonable search under the Fourth Amendment. When a warrantless search is made pursuant to an arrest, "[t]he

constitutional validity of the search . . . must depend upon the constitutional validity of the . . . arrest." United States v. Kithcart, 134 F.3d 529, 531 (3d Cir. 1998) (citing Beck v. Ohio, 379 U.S. 89, 91 (1964)).  Whether a warrantless arrest is constitutionally valid depends in turn upon whether, at the moment the arrest was made, the officers had probable cause to make the arrest.  Id.  Specifically, the Court must determine whether the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense.  Id.; see also Barna v. City of Perth Amboy, 42 F.3d 809, 819 (3d Cir. 1994) (test for probable cause is objective test: did the police officer have a reasonable basis for believing that the suspect had committed or was committing a crime).

Here, the Government asserts that probable cause existed to arrest Gardner based on the evidence linking him to the firearm located in the stolen car, i.e., the display of a weapon by a male during the fight and the actors' flight in a white vehicle, all of which connected Gardner to the firearm in the backseat.  (Docket No. 47 at 29-33). Moreover, the Government also contends that officers at the scene recognized Gardner as a felon, thus providing probable cause to arrest him for merely possessing the firearm,

without regard to its having been used in a bar fight. (Docket No. 47 at 29-33). Based on the reliable information provided by the officers, the Court finds that the Government has established by a preponderance of the evidence that the police officers had probable cause to arrest Gardner for possession of the firearm in the backseat of the vehicle.

First, the vehicle at issue generally matched the witness description of the "white vehicle" that fled the scene of the bar fight. In addition, Officer Manfredi located the vehicle less than half a mile from the bar and only about ten to fifteen minutes after he received the dispatch call regarding the bar fight. (Transcript I at 9:10-20) (Officer Manfredi testifying). Second, Barfield, the driver of the vehicle, was visibly intoxicated, which indicated the pair had likely been at the bar, thus further linking them to the bar fight. (Transcript I at 21:07-23) (Officer Manfredi testifying). Third, the officers learned from a witness at the bar that the male actor involved had brandished a weapon. (Transcript I at 6:24-7:14, 15:23-17:19) (Officer Manfredi testifying). Therefore, when officers located the firearm underneath the child safety seat in the backseat of the vehicle – a vehicle that matched the description of the one that fled the bar fight – within arm's reach of where Gardner had been sitting, the

officers reasonably associated the firearm with Gardner. (Transcript I at 34:18-22) (Officer Mitchell testifying).

Constructive possession of an object exists if an individual knowingly has both the power and the intention at a given time to exercise dominion or control over a thing. United States v. Iafelice, 978 F.2d 92, 96 (3d Cir. 1992). With regard to Gardner's constructive possession of the gun, Officer Mitchell testified, as follows:

> Q: Had you not found the ammunition, would Mr. Gardner have been arrested?
>
> A: Yes.
>
> Q: Why is that?
>
> A: He was in joint possession of the handgun located in the back seat. There was also from what we believe that he had thrown the handgun from where it was located in the seat because it was by the door. And since he wasn't the driver, it would be easy for him to place it there where it was at.
>
> Q: Are you saying it would be difficult for the driver to put it under the seat?
>
> A: Correct.

(Transcript I at 35:10-21). Although there is no direct evidence that Gardner exercised control over the gun, the United States Court of Appeals for the Third Circuit has found that a gun that is within a defendant's reach "could easily justify the inference of . . . [his] constructive possession of the gun." United States v.

38

*Lopez*, 271 F.3d 472, 487 (3d Cir. 2001). See also United States v. Richardson, 265 F. App'x 62, 65 (3d Cir. 2008) (holding that defendant had constructive possession of firearm where defendant was a passenger in a vehicle and firearm fell out from passenger seat of car). Based on the circumstances here, the Court finds that the officers had sufficient probable cause to arrest Gardner for being a felon in possession of the firearm located in the backseat of the vehicle, which was out of the reach of the only other person in the car. Therefore, the officers' search of Gardner's person incident to his arrest inevitably would have led to the discovery of the ammunition in Gardner's pocket. Accordingly, Defendant's Motion to Suppress is denied on this alternative basis as well.

V.   CONCLUSION

Based on the foregoing, Gardner's Motion to Suppress [25] is DENIED. An appropriate order follows.

                                        *s/Nora Barry Fischer*
                                        Nora Barry Fischer
                                        United States District Judge

Date:     November 1, 2013

Cc/ecf:   All counsel of record.